IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EDWARD ELIOT KRAMER,

                    Plaintiff,

     v.                                              1:13-cv-1214-WSD

R.L. CONWAY, Gwinnett County
Sheriff; and DON PINKARD,
Colonel, Gwinnett County Adult
Detention Center,

                    Defendants.

## OPINION AND ORDER

This matter is before the Court on Edward Eliot Kramer's ("Plaintiff")

Motion for a Preliminary and Permanent Injunction [2], Plaintiff's Motion for

Leave to File Second Amendment to Verified Complaint [12], and Defendants'

First Motion for Summary Judgment [13].

## I.     BACKGROUND

Plaintiff is a pre-trial detainee at the Gwinnett County Jail (the "Jail") and

has been there since January 19, 2013.  (Tr. at 119.)  Plaintiff alleges that certain

conditions of his confinement at the Jail violate his right to practice his Orthodox

Jewish faith and he alleges a failure to accommodate certain physical disabilities from which he claims to suffer.

A.    Procedural Background

Plaintiff initiated this action by filing his verified complaint on April 15, 2013.  (Compl. [1].)  Plaintiff asserts the following claims in this action: (1) Defendants violated Plaintiff's rights under the U.S. Constitution and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") by restricting his right to possess religious books necessary for him to practice his Orthodox Jewish faith; (2) Defendants violated Plaintiff's constitutional right to possess those legal reference books he considers necessary to defend his criminal case and determine his legal rights as an inmate; and (3) Defendants violated the Constitution and the Americans with Disabilities Act ("ADA") by denying Plaintiff greater access to a typewriter for use in communicating with his lawyers and Jail officials, specifically by not allowing him to have a typewriter in his cell.  (Id. at 7-14.)

On April 17, 2013, Plaintiff filed his Motion for a Preliminary and Permanent Injunction (the "Injunction Motion").  (Mot. [2].)  Plaintiff seeks to prevent Defendants from continuing to violate his rights under federal law and seeks an order: (1) allowing Plaintiff to possess in his cell the religious books necessary to practice his Jewish faith; (2) allowing him to possess in his cell legal

materials necessary for his criminal case and to determine his legal rights as an inmate; and (3) allowing him to have a typewriter in his cell to use to communicate with his lawyers and others.  (Id. at 6-7.)

Plaintiff amended his complaint on April 23, 2013.  (Am. Compl. [8].)  In the amendment, Plaintiff supplements his claim based on the alleged denial of legal reference books.  (Id.)  Plaintiff asserts now that Jail officials unreasonably rejected a package containing four soft-cover books shipped from Prison Legal News because it violated the Jail's four-pound limitation on mailed material.  (Id.)  Plaintiff also contends that the Jail's policies prohibiting receipt of packages weighing more than four pounds and prohibiting possession of more than four soft-cover books in Plaintiff's cell violates his constitutional rights, including his right to practice the Jewish faith.  (Id.)  Defendants filed their motion for summary judgment after the amended complaint was filed.  (Mot. [13].)

Plaintiff moved to further amend his complaint to add a claim under the ADA based on events that allegedly occurred on April 26, 2013, when Plaintiff attended a bond hearing in his state criminal case.  (Mot. [12].)  Plaintiff asserts that he was denied a reasonable accommodation of his disability at the April 26, 2013 hearing.  (Id.)

Plaintiff seeks, in this action, declaratory and injunctive relief, attorney fees and litigation costs.  (Compl. [1] at 14-15; Am. Compl. [8] at 4.)  He does not seek damages.  (Id.)

The Court conducted a hearing on the Injunction Motion on August 13, 2013, which was a consolidated hearing on Plaintiff's request for preliminary injunctive relief and a trial on the merits regarding his request for permanent injunctive relief (the "August 13th Hearing").[1]  See Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing.").  The Court notified the parties in its August 8, 2013 Order setting the hearing, and the parties agreed, that the August 13th Hearing would be on Plaintiff's request for preliminary and permanent injunctive relief.[2]  (Order [27] at 2; Tr. at 4.)

Testimony of four witnesses was presented at the August 13th, 2013 Hearing.  The witnesses were: Rabbi Douglas Stein, Plaintiff, Defendant Don

---

[1]   The Court cites the transcript of the hearing, which is the only transcript in this case, as simply "Tr."

[2]   In consolidating the issues of preliminary and permanent injunctive relief in a single hearing, courts "must preserve any party's right to a jury trial."  Fed. R. Civ. P. 65(a)(2).  No party requested a jury trial in this case, and they agreed to a consolidated hearing, before the Court, on the preliminary and permanent injunction motions.  (See Compl. [2]; Am. Compl. [8]); Fed. R. Civ. P. 38.  Because the August 13th Hearing constituted the trial on the merits of Plaintiff's claims, Defendants' motion for summary judgment is moot.

Pinkard, and Lieutenant Adrian Watkins.  (Tr. at 2.)  Various exhibits also were

introduced at the hearing.[3]

     B.    <u>Factual Findings</u>

Plaintiff is housed in a medical cell in the infirmary at the Jail.  (<u>Id.</u> at 47, 48,

138.)  He does not have cellmates.  (<u>Id.</u>)  Plaintiff's medical cell is approximately

three times larger than a non-medical cell.  (<u>Id.</u> at 47-48.)

Lieutenant Adrian Watkins works at the Jail and oversees Plaintiff's

confinement and has since approximately February 2013.  (<u>Id.</u> at 95-96.)

Defendant Colonel Don Pinkard is the Jail Administrator.  (<u>Id.</u> at 132.)  Defendant

R.L. Conway is the Sheriff of Gwinnett County.

Plaintiff is an observant Orthodox Jew and has been all his life.  (<u>Id.</u> at 39-

40.)  He reads English, Hebrew, and some Aramaic.  (<u>Id.</u> at 39.)  Plaintiff and

Douglas Stein, a newly ordained Rabbi, testified at the hearing about the religious

practices of Orthodox Jews.  The practices at issue in this case involve the study of

various religious books and recitation of prayers in these texts.

According to Rabbi Stein, Plaintiff needs nine prayer books to observe his

faith.  (<u>Id.</u> at 22-23.)  They consist of a daily Siddur, [4] a Chumash (the Old

---

[3]    All of the offered evidence was admitted except Plaintiff's written
declaration.  Portions of that declaration were inadmissible, and counsel for
Plaintiff elected for Plaintiff to testify at the hearing.  (Tr. at 19.)

Testament), a book for each of the five Jewish holidays, a book of Psalms, and in 2014, a Megillah for the holiday of Purim.  (Id. at 22-24.)  Rabbi Stein testified that it is "desirable" for an observant Orthodox Jew to have a few books summarizing the laws of each Jewish holiday to prepare for each holiday, and he identified seven texts used for that and other purposes.[5]  (Id. at 23-25.)  Rabbi Stein testified it is acceptable for an Orthodox Jew to read Hebrew scriptures translated into English and to read scriptures and prayers copied from a hardback book.  (Id. at 30, 36.)

Plaintiff initially testified that his faith requires him to read "approximately twelve to fifteen different texts . . . on a daily basis."  (Id. at 45.)  He later testified that "in one day's time, I will use approximately ten books, because you are reading only a certain portion out of each book."  (Id. at 82-83.)  The books Plaintiff identified also were identified by Rabbi Stein.  Plaintiff also testified that his faith requires him to read only portions of the prayer books each day.  (Id. at

---

[4]     The witnesses at the hearing did not spell any of the religious terms they used, making transcription of those terms difficult.  Plaintiff did not submit a list of the terms for the court reporter's use in ensuring the proper spelling.  Thus, the terms may not be spelled correctly in this Order.

[5]     Rabbi Stein identified those seven texts as Maimonides, a Shulchan Aruch, a Megillah for Jonah, a Megillah for Yonah, the Mishna, the Talmud, and the Torah. (Tr. at 23-25.)

40-41, 82-83.)  "You cycle through different portions" and often "are only reading a small portion" at any given time.  (Id. at 41.)

Plaintiff studies the books and prays at dawn, midday, sunset, and at midnight.  (Id. at 48-49.)  Jail officials have installed a clock in front of Plaintiff's cell for his use in determining when to engage in his faith practices.  (Id. at 49.) Jail officials also altered their lights off policy for Plaintiff.  The general policy is that lights are turned off at the Jail at midnight.  (Id. at 66, 109.)  Jail officials leave them on at Plaintiff's cell until 12:30 a.m. to allow him time for his midnight readings and prayer.  (Id.)  Jail officials made that accommodation at the request of Plaintiff's rabbi.  (Id. at 136-37 & Defs.' Ex. 6; see infra.)[6]

Jail policy prohibits inmates from: (1) having hardback books in their cell; (2) having more than four soft-cover books in their cell; and (3) receiving, from a source outside of the Jail, any package weighing more than four pounds.  (Tr. at 96-97, 111.)  Hardback books are prohibited in cells because it is easier to conceal contraband in hard covers, it is more time-consuming for Jail officials to search

---

[6]      Lights are turned on at the Jail, including for Plaintiff, at 5:00 a.m.  (Tr. at 110.)

hard covers when they arrive at the Jail, and because hardback books can be used as weapons by inmates.  (Id. at 132-33.)[7]

The number of soft-cover books allowed in a cell also is limited, including because several soft-cover books placed in a pillow case allows the pillow case to be used as a weapon.  (Pinkard Decl. [13-1] at 1-3.)  Limiting soft-cover books in a cell also reduces fire risk, avoids clutter that can impede Jail officials or medical personnel from performing necessary tasks in cells, and otherwise facilitates order in cells.  (Id.)

The four-pound limit on incoming packages is necessary to handle, process and search the large volume of mail the Jail receives.  (Id.; Tr. at 133.)  All incoming items are required to be searched for contraband to ensure the safety and security of all persons at the Jail.  (Id.)  Jail officials do not consider the content of any particular book in applying the four-pound restriction.  (Tr. at 112, 117.)

Jail officials have granted to Plaintiff a variety of exceptions to these policies.  Plaintiff is allowed to have four soft-cover religious books and four soft-cover non-religious books, for a total of eight soft-cover books, in his cell at all

---

[7]     The burden to search and the scope of the concern for stability requires some further context.  The Jail is a large facility.  It has the capacity to house almost three thousand people, both men and women, who must for various functions be segregated. (Tr. at 118, 133.)  For example, to protect women, male prisoners are not allowed in the library when women prisoners are there.  (Id. at 117-18.) Currently, there are a total of 2,200 prisoners in the Jail.  (Id. at 133.)

times.  (Id. at 96.)  Plaintiff can, at least once each weekday, exchange those books for other books stored in the Jail's law library.[8]  (Id. at 103-05; see infra.)  The Jail, in response to Plaintiff's requests, agreed to store in the library books sent to Plaintiff in addition to books he is allowed in his cell.  (Tr. at 114-16.)  Books that are sent to him must be in packages weighing no more than four pounds.  (Id.)  The number of four-pound packages that can be sent is not limited.  (Id.)  At least four religious and legal books, including hardback books, currently are stored in the library for Plaintiff.  (Id. at 97 & Defs.' Ex. 8.)

Plaintiff also is allowed to keep five plastic storage bins in his cell.[9]  (Id. at 106-08 & Defs.' Ex. 9.)  Other inmates are allowed only two.  (Id.)  At least three of Plaintiff's bins contain loose copies of legal and other materials.  (Id.)

Jail officials liberally allow Plaintiff to photocopy books or other materials in the law library and to store those copies in the bins in his cell.  (Id. at 104-08.)  Plaintiff has requested and received copies of court opinions and other legal materials, but has not requested copies of pages from books for use in his cell.[10]

---

[8]     Religious works, including Jewish bibles, are maintained in the law library. (Tr. at 97-98 & Defs.' Ex. 8.)
[9]     Each plastic bin is about twice the size of a standard cardboard banker's box. (Tr. Defs.' Ex. 9.)
[10]    Plaintiff disputed the extent to which he is allowed to photocopy books and materials in the library and the ease with which he can exchange books in his cell for other books in the library.  The Court did not find his testimony in that regard

(Id. at 97-99, 105; see id. at 70 ("I would say that there is not a single day that I have ever been to the library that I have not walked out with my limit of copies. Not a single day.").)

Jail officials made many of the accommodations described above at the request of rabbis who have written to the Jail on Plaintiff's behalf.  Jail officials frequently communicate in writing and by phone with those serving as rabbis to determine what Plaintiff needs to practice his religion, and the Jail largely has provided to Plaintiff what the rabbis requested.  (Id. at 100-02, 135-37 & Defs.' Ex. 6.)  For example, once Lt. Watkins spoke with a rabbi by phone about hardback religious books Plaintiff wanted to receive from a publisher.  (Id. at 100-02.)  Watkins told the rabbi that the books could be received if the hard covers were removed.  (Id.)  The rabbi communicated with the publisher, who removed the hard covers before shipping the books to Plaintiff at the Jail.  (Id.)  Jail officials took the books to Plaintiff.  (Id. at 102.)  The publisher's removal of the cover apparently allowed some of the outer pages to become loose.  (Id. at 102-03.)  Jail personnel offered tape to Plaintiff so he could attach these loose pages to the text.

credible because he gave contradictory answers when questioned by the Court when compared to answers he gave in response to questions from his counsel.  The Court found Lt. Watkins' testimony on those same subjects credible, internally consistent, and consistent with the documentary evidence.  Lt. Watkins testified that Plaintiff copies up to as many as 100 pages of material a week.  (Tr. at 98-99.)

(Id.)  Plaintiff refused the books, assuming that the hard covers had been removed by Jail officials in disrespect for the books.[11]  (Id.)[12]

Although allowed to keep four soft-cover books in his cell in addition to his four religious books, Plaintiff currently has only three non-religious books.  (Tr. at 67-68, 74-75.)  Two of them are legal texts, including the Federal Rules of Civil Procedure, and the other is a work of science fiction.  (Id.)

On an occasion in the past Jail officials rejected shipments to Plaintiff of legal books from Columbia University and Prison Legal News because the packages each exceeded the Jail's four pound mail policy.  (Id. at 49-50, 75-78,

---

[11]     This assumption by Plaintiff illustrates his unwillingness to objectively consider the conduct of Jail officials and their intentions.  For example, Plaintiff refused to believe the covers were removed by the publisher and that this was done as arranged by his rabbi.  Plaintiff's credibility is eroded by another unreasonable position in this case.  Plaintiff has retained three lawyers to represent him in three pending legal cases, including this one.  (Tr. at 71-72.)  Two lawyers represent Plaintiff in his criminal case, and his counsel in this case also represents him in a civil action regarding a corporation.  (Id. at 63, 71-72.)  Plaintiff's lawyers can visit him at the Jail and communicate with him by telephone and in writing.  (Id. at 61-62, 72.)  Plaintiff testified that he is able to receive copies of court opinions from his lawyers and that they always send him what he requests.  (Id. at 69-72.)  Plaintiff, however, thinks it is unrealistic and unaffordable to ask his lawyers to print documents and send them to him.  He prefers copies of the documents be made for him in the library.  (Id. at 70-73.)

[12]     Jail officials have provided Plaintiff other items to accommodate the practice of his religion that are not at issue in this case.  For example, Plaintiff is allowed to wear a Yamaka and religious shawl at all times; is allowed to use a Tefillin, which is a leather strap to which a box is attached, and Totafot while praying; was allowed to order a Shofar (traditionally a ram's horn) for use at upcoming religious holidays; and he receives a kosher diet.  (Tr. at 42-43, 63-64, 108-09.)

125-27, 130 & Defs.' Ex. 10.)  A book called the Jailhouse Lawyer's Manual, which apparently is a hardback volume, was shipped to Plaintiff and is kept in the law library for his use.  (Tr. at 77 & Defs.' Ex. 8.)

Plaintiff has several medical conditions and receives disability benefits from the Social Security Administration.  (Tr. at 51-52.)  Plaintiff attributes his conditions primarily to two events.  In 2000, Plaintiff broke his neck and has had five surgeries to address the injury.[13]  (Id.)  As a result of the 2000 incident, Plaintiff is unable to walk, has no feeling below his knees and has neuropathy in three fingers on each hand.  (Id. at 52-53.)  He also suffers intermittent parasthesia that routinely requires supplemental oxygen.  (Id.)  Plaintiff also has psoriatic arthritis, resulting in deformation of the bones in his fingers and severe pain when he writes with his hands.  (Id. at 52, 54.)  He acknowledges that he writes "a huge – an inordinate amount," but states that "it hurts terribly."  (Id. at 54.)

Plaintiff testified that he "probably write[s] a hundred times as much as [he] type[s]," and he uses a typewriter in the Jail's law library on weekdays.  (Id. at 56.)[14]  Inmates other than Plaintiff generally are allowed to visit the law library for one and a half hours every two weeks.  (Id. at 117.)  Plaintiff is allowed to visit the

---

[13]    Plaintiff claims the injury was caused by an assault on him by a "masked deputy" during a mock drill at the Jail.  (Tr. at 51.)

[14]    The law library is not open on weekends when staff is not available.  (Tr. at 121.)

library every weekday for at least an hour each day.  (Id. at 117-18.)  Unless there

is a scheduling conflict, Plaintiff is allowed to stay in the library as long as he

desires to use the typewriter or review books and other legal materials.  (Id.)

Lt. Watkins' testimony about Plaintiff's access to the library is credible, and the

Court does not accept Plaintiff's testimony that his access is more limited.  The

Court notes that Plaintiff acknowledges he can access the library at least an hour

each weekday and has spent more than an hour there on occasions.  (Id. at 89-90,

144.)  Thus he acknowledged he is given substantially greater law library access

than any other prisoner.

The library sign-in sheets completed by Plaintiff corroborate Plaintiff's

considerable access, showing that he visited the library seventy-nine (79) times

over four and a half months, with most of the visits lasting more than one hour.

(Tr. Defs.' Ex. 3.)  The Jail's documentation of Plaintiff's activities during his

library visits shows he has significant access to the typewriter, and assistance by

library staff to make photocopies for him or to make other information available.

(Tr. Defs.' Ex. 4.)

## II.    STANDARD FOR OBTAINING INJUNCTIVE RELIEF

A party seeking preliminary injunctive relief must produce evidence

demonstrating: (1) a substantial likelihood of success on the merits of his claims;

(2) that plaintiff will suffer irreparable injury unless an injunction is issued; (3) that the threatened injury to plaintiff outweighs any harm the proposed injunction might cause the non-moving party; and (4) that the requested injunction would not be adverse to the public interest.  Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1273-74 (11th Cir. 2013).  "In this Circuit, [a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites."  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

The movant cannot rest on allegations in his pleadings, but must present competent evidence establishing all four prerequisites.  See id.  If the movant fails to establish one or more of the four prerequisites, the Court is not required to address the others.  Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994).  The first requirement, that the movant demonstrate a substantial likelihood of success on the merits, "is generally considered the most important of the four."  White v. Alcon Film Fund, LLC, No. 1:13-cv-1163-TCB, 2013 WL 3821571, at *1 (N.D. Ga. July 24, 2013); see Odebrecht, 715 F.3d at 1274 ("Here, as in so many cases, the first question is critical."); Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986) ("Ordinarily the first factor is the most important.").

The standard for a permanent injunction is essentially the same as the standard for a preliminary injunction, except that the movant must show actual success on the merits of his claim.  Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004).  That is, the movant must "establish the fact of the [constitutional or statutory] violation."  Newman v. Alabama, 683 F.2d 1312, 1319 (11th Cir. 1982).  "He must then demonstrate the presence of two elements: continuing irreparable injury if the injunction does not issue, and the lack of an adequate remedy at law."  Id.; see also Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1127-28 (11th Cir. 2005) (listing those three requirements for obtaining a permanent injunction).

## III.   DISCUSSION

### A.   Plaintiff's Claims Regarding Religious Books

Plaintiff contends that denial of certain religious prayer books he claims he needs to practice his faith violates RLUIPA and his right under the First Amendment to the Constitution to freely exercise his religion.  Both claims fail.

#### 1.   *RLUIPA*

"RLUIPA targets only two areas: land-use regulation and institutions that receive federal funds."  Knight v. Thompson, ___ F.3d ___, No. 12-11926, 2013 WL 3843803, at *6 (11th Cir. July 26, 2013).  RLUIPA's provision regarding

institutionalized persons applies only if the challenged "program or activity []

receives Federal financial assistance" or the burden on religious exercise affects

commerce with foreign nations, among the states, or with Indian tribes.  42 U.S.C.

§ 2000cc-1(b).  In short, to establish a prima facie case under RLUIPA when, like

here, interstate and Indian commerce are not involved, a plaintiff must show that

the alleged burden on his religious exercise was "imposed in a program or activity

receiving federal funding."  McCree v. Pocock, No. 1:06-CV-1279-TWT, 2007

WL 1810143, at *2 (N.D. Ga. June 19, 2007).

Plaintiff did not present any evidence at the hearing, and there is no evidence

otherwise in the record, to show that the Jail receives federal funding in connection

with the activities he challenges in this case.  In fact, Plaintiff did not present any

evidence that the Jail receives any federal funding.  There is no evidence to support

even an inference that the Jail receives federal funding in connection with the

challenged activities.

Defendants argue in their motion for summary judgment, and in their motion

to dismiss Plaintiff's RLUIPA claim, that Plaintiff did not allege in his complaint

or amended complaint that the Jail receives federal funds.  (Br. [13-6] at 10.)

Plaintiff's only response to this argument is a general, factually unsupported

statement that two pages of the Jail's inmate handbook acknowledge that the Jail

16

"processes and maintains custody of illegal aliens" with "all duties and responsibilities . . . performed by ICE trained deputies."  (Reply [21] at 2-3 (mentioning, but not providing, two pages of the inmate handbook).)  He presupposes that the Jail "therefore receive[s] financial assistance from the United States Government."  (Id.)  Plaintiff's conclusory argument, made two months before the August 13th Hearing, was not before, at, or after the hearing supported by any factual support.  Plaintiff even has failed to produce the pages from the inmate handbook that he suggests supports his federal funding inference, and he otherwise has failed to produce any evidence that the Jail receives federal funding.[15]

It was Plaintiff's burden, including at the hearing, to present evidence necessary to establish his claims.  His failure to present any evidence that the Jail receives federal funds precludes relief under RLUIPA.  See McCree, 2007 WL 1810143, at *2; Schneider v. Ferguson, No. CV 305-158, 2007 WL 1521610, at *13 (S.D. Ga. May 23, 2007) (granting summary judgment to defendants on

---

[15]    Even if Plaintiff had produced the two purported pages of the inmate handbook regarding immigration activities, it does not appear from his description of those pages that they contain evidence of the Jail's receipt of federal funds. Evidence of the receipt of federal funds for processing or detaining illegal aliens is not evidence that the Jail receives federal funds for the "program or activity" at issue here – the alleged denial of religious books to a non-alien Jail inmate.  See 42 U.S.C. § 2000cc-1(b).

RLUIPA claim because "there is no evidence in the record that [the prison] received 'Federal financial assistance' for the programs and activities in question").[16]

2.   *Free Exercise Clause*

Generally speaking, a plaintiff prevails on a First Amendment Free Exercise Clause claim by showing "that the government has impermissibly burdened one of his sincerely held religious beliefs." Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1294 (11th Cir. 2007) (quotation marks omitted).  When the plaintiff is a prison or jail inmate, the claim is evaluated under the standard stated in Turner v. Safley, 482 U.S. 78 (1987).  Hathcock v. Cohen, 287 F. App'x 793, 799 (11th Cir. 2008) ("[I]nmates retain the right to free exercise of religion subject to prison regulation consistent with the Turner reasonableness standard.").

---

[16]   Even if Plaintiff had produced evidence of federal funding, he has not proved that the Jail polices he challenges in this case "substantially burdened" the exercise of his religion.  See 42 U.S.C. § 2000cc-1(a).  A substantial burden is one that "completely prevents the individual from engaging in religiously mandated activity." Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004).  Policies that inconvenience religious exercise do not impose a substantial burden.  Id.  As discussed further below, the evidence does not support a finding that the challenged Jail policies prevent Plaintiff from practicing his Jewish faith, but instead shows that Plaintiff has been provided ready access to the items, books and materials he needs to practice his faith.  The evidence also shows that the Jail has employed the least restrictive means of furthering penological interests that have long been recognized under the law as compelling, including by making significant concessions to Jail policy for Plaintiff.

Turner establishes that a regulation impinging on an inmate's constitutional rights is permissible "if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89.  The following factors "are relevant in determining the reasonableness of the regulation at issue": (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest that justifies it; (2) whether alternative means of exercising the constitutional right remain open to the inmate; (3) the impact accommodation of the asserted constitutional right will have on guards, other inmates, and the allocation of prison resources generally; and (4) "the absence of ready alternatives is evidence of the reasonableness of a prison regulation," while "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns."  *Id.* at 89-90 (quotation marks omitted). The governmental interest analyzed in the first factor must be neutral, which in the First Amendment context means that the court must review whether the challenged regulation "operated in a neutral fashion, without regard to the content of the expression."  *Id.* at 90.

Applying the first Turner factor, the evidence demonstrates that the Jail's policies limiting the number of religious books Plaintiff can keep in his cell, but providing him access to others that are not; limiting religious texts to those that do

19

not have hard covers; and limiting package mail to four pounds are all based on legitimate penological interests.  In a facility that houses 2,200 inmates, a uniformly applied books-in-cell limitation is reasonable, especially where the access to other books is made by exchanging out titles and by allowing the copying of parts – or conceivably, all – of a text.  Rabbi Stein, Plaintiff's expert at the August 13th Hearing, identified sixteen books that an Orthodox Jew would, at various times, choose to use in practicing his faith.  He identified only nine required prayer books.  Plaintiff argues he needs all sixteen books (and some unidentified additional titles), at all times, to be available in his cell.[17]  Plaintiff does not claim he is denied access to the nine required books, arguing only that access is required to be more convenient.  Plaintiff's demands are unreasonable and ignore the Jail's penological interests in imposing reasonable access to books.

Jail policy also prohibits hardback books in cells for legitimate penological reasons.  The evidence at the hearing was that hardcover books pose safety and security risks because hard covers can be used to conceal contraband and because

---

[17]     He seems also to argue that because he has a cell all to himself that is larger than a regular inmate cell, it is unreasonable not to let him use his available storage space to use any books he chooses.  This self-serving argument does not address any of the penological considerations of treating inmates in a uniform way, the burden on Jail personnel to monitor the increase in volume of materials demanded by Plaintiff, and it does not recognize that the Jail has exceeded by two times the number of books Plaintiff is allowed in his cell – an advantage of which Plaintiff was not exploiting at the time of the hearing.  See infra.

of their potential use as weapons.  See Bell v. Wolfish, 441 U.S. 520, 550-51

(1979) ("It hardly needs to be emphasized that hardback books are especially

serviceable for smuggling contraband into an institution. . . . They also are difficult

to search effectively.").[18]

In sufficient quantities, soft-cover books also may be used as weapons, and

they present fire and obstacle hazards.  It is for these reasons that the Jail limits, to

four, the number of soft-cover books allowed per person in a cell.  The Jail

receives a large volume of mail and other items each day, all of which must be

searched for contraband and threats their contents may pose to the safety and

security of inmates and Jail officials.  The policy prohibiting any single package

from weighing more than four pounds is rationally related to the excessive volume

---

[18]     In Bell, the Supreme Court reviewed a detention center's policy that
prohibited incoming shipments of hardback books unless they came directly from a
publisher, book store, or book club.  Bell, 441 U.S. at 550.  The Court held the
policy did not violate the inmates' First Amendment rights for reasons consistent
with the considerations reflected in Turner's four-factor test.  Id. at 550-52.
Plaintiff misapplies Bell to suggest that Bell holds that the Constitution requires
jails to accept hardback books sent from publishers.  (Br. [2-1] at 5, 8).  Neither
Bell nor any other Supreme Court decision has recognized a constitutional right to
receive hardback books in a jail or prison.  The Supreme Court in Bell did not
consider whether the institution's policy of accepting hardbacks from publishers
was constitutionally required.  The Court finds it is not.  Bell also did not address
whether possession of hardback books in an inmate's cell, the issue in this case,
was constitutionally required.  The Court finds again that it is not.  It is undisputed
that the Jail accepts hardback books, including religious books, shipped to Plaintiff
and keeps those books in the library for his review in that part of the Jail.

of mail received each day at the Jail, and it is reasonably related to legitimate safety and security interests that are addressed by enabling the Jail, considering the Jail's personnel and other resources, to search all incoming items.

The number of books allowed in a cell, the hardcover book, and the package weight limitations in place at the Jail are all rationally connected to the Jail's legitimate penological interests.

The evidence further demonstrates that these policies were enacted and are applied in a neutral way.  In applying these policies, the Jail considers only the weight of incoming packages, the type of cover on a book (hard or soft), and the number of soft-cover books in a cell.  The expressive content of books is not considered.  Cf. Tariq v. Chatman, No. 1:11-CV-159 (WLS), 2012 WL 3637729, at *2-3 (M.D. Ga. Aug. 22, 2012) (holding inmate stated a viable claim regarding rejection of Noble Qu'ran because rejection was based on the content of the book and not any formal policy).  The policies are neutrally applied to all books, regardless of content.

Applying the second Turner factor, the evidence demonstrates that ample alternative means are available to Plaintiff to access the religious books necessary to practice his religion.  Jail officials will store in the library soft and hard-cover books that Plaintiff receives in excess of the four he is allowed to store in his cell.

Plaintiff can exchange the four religious books in his cell with other soft-cover religious books on a daily basis, during the five days per week the library is open. Rabbi Stein, Plaintiff's Orthodox Judaism expert, testified that Plaintiff needs only nine religious books to practice his faith – one of which is not needed until Purim in 2014 – and an additional seven texts are desirable.  It is undisputed that Plaintiff must read only portions of those books at various times each day.  The Jail's policy allows for Plaintiff to access all the required religious books each day to study, and to recite prayers.[19]

Plaintiff also may photocopy portions of religious books, including prayers from books maintained in the library, and these copies may be taken to and maintained by Plaintiff in his cell.  These copies are allowed in addition to the eight soft-cover books Plaintiff may keep in his cell.  (See Tr. at 87-88 (Plaintiff testifying that he is allowed to make copies of his hardback Hebrew Tanakh that is kept for him in the library and to take these copies to his cell).)  Rabbi Stein testified that use of copies is acceptable for Plaintiff to practice his religion.[20]  Jail

---

[19]     The evidence shows that Plaintiff can visit the library at most any time during weekdays unless there is a scheduling conflict.  The library sign-in sheets show that Plaintiff visits the library at various times of day and usually in late morning.  (Tr. Defs.' Ex. 3.)

[20]     To the extent Plaintiff complains that he does not have access to the library on Saturday and Sunday, he is allowed to make copies of library materials for use in his cell during the weekend.

officials have given to Plaintiff access to the religious books he and Rabbi Stein claim are necessary to practice Plaintiff's faith.[21]

The Court notes further that the lights in Plaintiff's cell are left on thirty minutes longer than for others housed at the Jail and that this accommodation was made to Plaintiff because his rabbi told the Jail that additional lighting was necessary for Plaintiff to read his religious books at midnight. Thus, Plaintiff has reading light each day from approximately 5:00 a.m. to 12:30 a.m. (all but four and a half hours of the day). Light is available at all of the times Plaintiff testified that he recites his prayers.

In short, Jail officials have enacted reasonable, sensible, and constitutionally sound policies governing access to, possession of, and ability to read books by those confined at the Jail. To these policies the Jail has granted various reasonable – if not generous – exceptions to Plaintiff to accommodate his and his rabbis' specific requests enabling Plaintiff to fully practice his faith. See Turner, 482 U.S. at 90 ("Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." ); Skelton v.

---

[21]    Jail officials go so far as to communicate with Plaintiff's rabbi to ensure that Plaintiff has available to him in the library those books that are traditionally accessed during Jewish holidays.

Pri-Cor, Inc., 963 F.2d 100, 102-04 (6th Cir. 1991) (applying Turner in holding that policy prohibiting inmate from having hardback Bible was reasonable, with the "determinative factor" being that inmate could have a soft-cover Bible); Jackson v. Elrod, 881 F.2d 441, 444-45 (7th Cir. 1989) (inmate's rights were violated where he was prohibited from having hardback and soft-cover books, was not allowed to access the library, and "had no alternate source for the information").[22]

Applying the third Turner factor, the Court finds that allowing Plaintiff to possess in his cell all the religious books he seeks, including those he claims must be made available to him in hardback, would adversely affect Jail operations and the allocation of Jail resources generally.  It would require increased supervision of Plaintiff and his use of these additional books, and for the reasons stated before would present a safety and security issue.  Increasing the number of cell books and abandoning the hardcover book limitation and mail weight limit of four pounds also would increase the burden on Jail staff, be unfair to others, increase the possibility of inmate tension and disruption, and otherwise increase the risk of contraband entering the Jail.  "In the necessarily closed environment of the

---

[22]    The Jail procured for Plaintiff a hard copy Jewish Bible kept for him in the library.  Plaintiff and Rabbi Stein object to this translation.  In light of this objection, apparently first communicated at the August 13th Hearing, the Jail might consider obtaining another translation for Plaintiff's reference use.

correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." <u>Turner</u>, 482 U.S. at 90.

The fourth and final <u>Turner</u> factor is whether Jail officials have ready alternatives to the challenged book policies. "This is not a 'least restrictive alternative' test: [jail] officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." <u>Id.</u> at 90-91. There simply is no evidence in this case of "obvious, easy alternatives" to the challenged policies that "fully accommodate[ Plaintiff's] rights at *de minimis* cost to valid penological interests" that were not afforded to Plaintiff. <u>See id.</u> The Jail already has incurred an increased burden to make sound, generous policy exceptions to Plaintiff. Jail officials have relaxed the soft-cover book policy as an accommodation to Plaintiff and provided him with alternative means of accessing religious books.

Reviewing the evidence presented here, the Court concludes that the few challenged policies limiting Plaintiff's receipt and possession of religious books in his cell are reasonably related to the Jail's legitimate penological interests and they do not violate Plaintiff's right under the First Amendment to exercise his religion. A jail inmate only "retains those First Amendment rights that are not inconsistent

with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). "This is because certain privileges and rights must necessarily be limited in the prison context." Johnson v. California, 543 U.S. 499, 510 (2005). Plaintiff here objects to the policies in place because they require structure and inconvenience he prefers not to endure. But the policies in place, including the exceptions extended to Plaintiff, are practically and constitutionally reasonable. Because Plaintiff is confined on pending criminal charges some curtailment of his usual freedoms is necessary and allowed. See id. Plaintiff has not met his burden of showing that he is entitled to injunctive relief on his First Amendment claim.

> B.   Plaintiff's Claim Regarding Legal Books

Plaintiff' claim he is entitled to additional legal books is grounded solely on the Fourteenth Amendment's Due Process Clause. (Tr. at 6-7.) At the conclusion of the hearing, Plaintiff's counsel reiterated, as he argued in his brief in support of his motion for injunctive relief, that Bell v. Wolfish controls the claim. (Id. at 146.)

The Supreme Court held in Bell that the Due Process Clause prohibits the punishment of a pretrial detainee. The Court then observed that "[n]ot every

disability imposed during pretrial detention amounts to 'punishment' in the

constitutional sense." <u>Bell</u>, 441 U.S. at 535-37.  The Supreme Court elaborated:

> A court must decide whether the disability is imposed for the purpose
> of punishment or whether it is but an incident of some other legitimate
> governmental purpose. Absent a showing of an expressed intent to
> punish on the part of detention facility officials, that determination
> generally will turn on whether an alternative purpose to which [the
> restriction] may rationally be connected is assignable for it, and
> whether it appears excessive in relation to the alternative purpose
> assigned [to it]. Thus, if a particular condition or restriction of pretrial
> detention is reasonably related to a legitimate governmental objective,
> it does not, without more, amount to "punishment."
> . . .
> Restraints that are reasonably related to the institution's interest in
> maintaining jail security do not, without more, constitute
> unconstitutional punishment, even if they are discomforting and are
> restrictions that the detainee would not have experienced had he been
> released while awaiting trial. We need not here attempt to detail the
> precise extent of the legitimate governmental interests that may justify
> conditions or restrictions of pretrial detention. It is enough simply to
> recognize that in addition to ensuring the detainees' presence at trial,
> the effective management of the detention facility once the individual
> is confined is a valid objective that may justify imposition of
> conditions and restrictions of pretrial detention and dispel any
> inference that such restrictions are intended as punishment.

<u>Id.</u> at 1873-75 (citations and quotation marks omitted).  The Supreme Court later

refined these principles into the four-factor standard, adopted in <u>Turner</u>, to test jail

regulations that impinge on an inmate's constitutional rights, holding that a

regulation is valid if it is reasonably related to legitimate penological interests.

There is no evidence that Defendants have applied or are applying the number and type of legal books allowed in a cell policy to punish Plaintiff. Plaintiff has not produced any evidence, direct or circumstantial, even to suggest the policies constitute punishment in violation of the Due Process Clause. The evidence actually is that the policies are reasonably related to legitimate penological interests and that the Jail has given Plaintiff substantial access to legal materials by enlarging the time he is allowed in the library and liberally allowing him to copy legal materials to keep in his cell.

First, there is no authority to support Plaintiff's claim that a limit on the number of soft-cover books allowed in a detained person's cell is unlawful. Plaintiff misplaces his reliance on Bell v. Wolfish to support his argument that an institution cannot place a reasonable limitation on the number of soft bound books in a cell. (Br. [2-1] at 5-6; Br. [21] at 13.) The Supreme Court in Bell did not express any view on the restrictions that may be applied to the possession of magazines or soft-cover books by inmates. Bell, 441 U.S. at 550 n.31. There is not any authority even suggesting that an inmate can possess in his cell as many soft-cover books as his cell size would allow. The law rather is that limits on books in cells can be set if they are reasonably related to legitimate penological

interests.  Turner, 482 U.S. at 89-90.  The Court finds that the Jail's limits on soft-cover books in cells satisfies that test.

The evidence in this case actually is that Plaintiff has significantly enlarged access to soft-cover books in his cell (eight rather than four for other detainees), and legal materials generally.  The Court finds credible Lt. Watkins' testimony that Plaintiff is allowed in his cell a total of eight soft-cover books – four religious and four other books.  Plaintiff admitted that he currently has four religious books and only two legal and one science fiction book in his cell – one book less than what he is authorized.  (Tr. at 67-68, 74-75.)

Second, Plaintiff is allowed to visit the Jail's law library every weekday for, at least, an hour.  The evidence demonstrates that Plaintiff uses the library regularly and often for more than an hour each time he visits.  (Tr. Defs.' Ex. 3.) Library staff assist Plaintiff to make photocopies of books and materials, including court opinions.  (Tr. Defs.' Ex. 4.)  Plaintiff testified that he makes over one hundred copies a week, and Lt. Watkins testified that on one occasion two hundred pages of legal materials were copied for him to take to his cell.  (Tr. at 70, 98-

99.)[23]  These copied materials are allowed to be stored by Plaintiff in his cell storage bins.[24]

Finally, Plaintiff receives copies of legal materials, such as court opinions, sent to him by his lawyers.  (Id. at 72.)  In fact, he has never been denied by the Jail to receive copies of court opinions or other legal materials sent to or given to him by his counsel.  (Id.)[25]  The evidence is that Plaintiff's lawyers are still a further resource for Plaintiff to obtain legal materials he complains he needs.

Plaintiff has not shown that the Jail's policy limiting the number of legal books he can have in his cell constitutes a punishment that violates the Due Process Clause, and Plaintiff has not shown that the policy regarding the number of books allowed in his cell is not reasonably related to legitimate penological interests.  Plaintiff is not entitled to injunctive relief on his claim he is unconstitutionally denied access to legal books.

---

[23]    One of the legal books Plaintiff ordered, the Jailhouse Lawyer's Manual, is kept in the library for his use.  (Tr. at 75-77 & Defs.' Ex. 8.)

[24]    Plaintiff has five cell-storage bins for his use to store photocopies of legal books and reference materials.  (Tr. at 106-08 & Defs.' Ex. 9.)  His storage capacity is effectively over two times that given to others confined at the Jail.

[25]    The Court does not find credible Plaintiff's claim that it is unrealistic and unaffordable for him to ask the two prominent lawyers he hired to defend him in his criminal case or the third lawyer he hired to represent him in this case to send him copies of court opinions relevant to the conditions he is litigating.

C.     Plaintiff's ADA Claim Regarding A Typewriter[26]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  Id. § 12131(2).  A person has a "disability" if he has (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) is regarded as having such an impairment.  Id. § 12102(1).  Title II applies to jails.  See United States v. Georgia, 546 U.S. 151, 154 (2006).

---

[26]     Although Plaintiff alleged in his complaint that the denial of greater use of a typewriter violated "the Constitution and laws of the United States," at the August 13th Hearing he identified only 42 U.S.C. § 1983, which is the procedural vehicle for asserting constitutional claims, and the ADA in connection with that claim. (Compl. [1] at 11-14; Tr. at 5 (Plaintiff's counsel identifying only the ADA as basis for claim regarding typewriter).)  Because Plaintiff did not identify any provision of the Constitution in connection with his disability claim, the Court considers the claim only under the ADA.

"[T]o state a Title II claim, a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007). Failure to provide a reasonable accommodation – or "reasonable modification" as the statute puts it – to services, programs, or activities for a disabled inmate may constitute discrimination in violation of Title II. See McGary v. City of Portland, 386 F.3d 1259, 1266 n.3 (9th Cir.2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards."); Wolfe v. Fla. Dep't of Corr., No. 5:10-CV-663-Oc-PRL, 2012 WL 4052334, at *4 (M.D. Fla. Sept. 14, 2012) ("Under the ADA, a plaintiff may establish discrimination by showing that the public entity refused to provide a reasonable accommodation for a disabled person."); but see Bircoll, 480 F.3d at 1082 n.13 (noting that Title II, unlike Titles I and III, does not expressly provide that failure to make reasonable modifications constitutes discrimination, but assuming without deciding that such a claim is available under Title II's regulations).

Plaintiff has shown by a preponderance of the evidence that he is a qualified individual with a disability, as that term is defined under Title II.  He has not shown that Defendants have discriminated against him because of his disability and he has not shown that provision of a typewriter for use in his cell is a reasonable accommodation.

Plaintiff did not present any evidence at the hearing of intentional discrimination on the basis of his disabilities.  There is no evidence that Defendants took an action or failed to take an action because of Plaintiff's disabilities or that any policy at the Jail is applied to Plaintiff to discriminate against him on the basis of his disability.  Plaintiff does not specifically identify the "benefit[] of the [Jail's] services, programs, or activities" from which he is being excluded, see 42 U.S.C. § 12132, but his pleadings and arguments indicate that he contends he is being denied the benefit of written communication with his lawyers[27] and Jail officials.  Plaintiff generally contends that Defendants are violating the ADA by not providing him a specific accommodation for his inability to write without pain – that he be allowed to have a typewriter in his cell.[28]

---

[27]     The Court assumes for the purpose of this analysis that Plaintiff refers to communication with the lawyers representing him in this and his criminal case and not the commercial case in which he apparently is a party.

[28]     It is undisputed that inmates at the Jail generally are allowed to communicate in writing with their lawyers and Jail officials.

The reasonable accommodation inquiry under Title II "is a highly fact-specific inquiry." Bircoll, 480 F.3d at 1085 (quotation marks omitted). Title II's implementing regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Reasonable accommodations that impose an undue burden on the public entity are not required. Bircoll, 480 F.3d at 1082-83 (citing Tennessee v. Lane, 541 U.S. 509 (2004)).

Plaintiff has not shown by a preponderance of the evidence that possession of a typewriter in his cell is a reasonable accommodation for his claimed handwriting disability. The evidence shows that Plaintiff is able to write by hand although he states he experiences pain when doing so. The evidence also shows that, if Plaintiff chooses to avoid writing by hand, Plaintiff may use his substantial access to a typewriter in the Jail's law library.[29]

---

[29] Plaintiff has written, by hand, hundreds of pages of documents in the few months he has been at the Jail. (Tr. at 56, 59-60.) An example of one of Plaintiff's lengthy writings, a four-page letter dated May 27, 2013, was presented at the hearing. (Id. Defs.' Ex. 1.) A careful review of this document shows precise, controlled, legible handwriting without any evidence that Plaintiff does not have the ability to write clearly and precisely, even if this process for him is slower than others. Plaintiff also wrote by hand, over the course of two weeks, the declaration

Plaintiff did not present any evidence of permanent harm from the handwriting he performs.  He also did not present any evidence of any communication to his lawyers or Jail officials that he was unable to make because he could not prepare it with a typewriter.  The evidence shows further that Plaintiff communicates with his lawyers and Jail officials in person at the Jail, and in the case of his lawyers, by telephone.  Plaintiff did not present evidence of any limitation on the number or length of his oral communications.  Although Plaintiff claimed that the telephone system at the Jail is poor and that it is difficult to hear the other party on the call, he did not identify any information he has been unable to convey to his lawyers or others and did not show a particular communication that was unsuccessful.

Finally, the evidence shows that Plaintiff has significant access to the typewriter in the Jail's law library.  Other inmates generally are allowed to visit the library only once every two weeks and then for only an hour and a half.  Plaintiff is allowed to visit the library every weekday for at least an hour.  The library sign-in sheet shows that Plaintiff signed into the library seventy-nine times in a four and a half month period, with most of the visits lasting more than one hour.  (Tr. Defs.'

---

he filed in this case, which, when typewritten, consisted of about twenty-three typed pages.  (Id. at 62; see Doc. 21-1.)  While Plaintiff testified at the August 13th Hearing that handwriting causes him severe pain, the evidence is that Plaintiff can write by hand and has done so extensively and often throughout his time at the Jail.

Ex. 3.)  Documentation of Plaintiff's activities during his library visits shows

significant access to the typewriter and assistance by library staff when Plaintiff

requested photocopies or other information or materials.  (Tr. Defs.' Ex. 4.)  The

evidence is consistent with Lt. Watkins' testimony that Plaintiff is given as much

time as he needs in the library on weekdays unless there is a scheduling conflict.

This testimony is credible and from it, and the other evidence presented, the Court

necessarily concludes that Plaintiff has significant access to the typewriter in the

library.  On the record here, and considering the other means available to Plaintiff

to communicate with his lawyers and Jail officials, the Court finds that Plaintiff

has not shown that denial of a typewriter in his cell violates his rights under the

ADA.  See Ganstine v. Sec'y, Fla. Dep't of Corr., 502 F. App'x 905, 910 (11th Cir.

2012) (rejecting inmate's ADA claim that he was unable to access certain areas of

the prison because he testified that orderlies were available most of the time to

push his wheelchair and that he sometimes pushed himself with difficulty).

The Court further finds that the accommodation of an in-cell typewriter

would fundamentally alter the nature of the Jail's core detention function and

impose an undue burden.  It is undisputed that typewriters have several parts,

including metal and moving parts, that can be used as weapons in a jail setting.

The Jail has legitimate, compelling interests in protecting the safety and security of

its inmates and staff, and to do so has a legitimate penological reason to deny cell access to devices – in this case a typewriter – that can be, in whole or in their parts, used as a weapon.  It would be an undue burden on Jail officials to have to supervise Plaintiff's use or misuse of a typewriter in his cell.

The Eleventh Circuit has observed that "[i]t is entirely possible that in the prison setting . . . the type of accommodation that will be enough to satisfy the [ADA's] reasonableness requirement must be judged in light of the overall institutional requirements.  Security concerns, safety concerns, and administrative exigencies would all be important considerations to take into account." Love v. Westville Corr. Ctr., 103 F.3d 558, 561 (11th Cir. 1996) (citing Turner, 482 U.S. 78).  Credible evidence of such concerns at the Jail was presented in this case. Having considered these concerns, the Court concludes that allowing Plaintiff to possess a typewriter in his cell, even if it qualified as a reasonable accommodation under Title II, would present a safety and security concern and impose an undue burden on Jail personnel.  The Jail has significant penological justification not to provide the accommodation Plaintiff requests.

The Court further concludes that Defendants are not violating Title II of the ADA by not giving Plaintiff additional access to the typewriter because Plaintiff has considerable access to a typewriter at the Jail's law library.  Plaintiff has

substantial access to the typewriter for almost as long as he likes for five days each week and there is no evidence Plaintiff does not or will not be able adequately to communicate with his lawyers, Jail personnel or others without a typewriter in his cell.  Plaintiff is not entitled to the injunctive relief he seeks under the ADA.

D.      Plaintiff's Motion To Amend His Complaint A Second Time

Plaintiff seeks in his motion to file a second amended complaint to add another claim under Title II of the ADA.  (Proposed Amend. [12-1].)  That claim is based on events that occurred on April 26, 2013, when Plaintiff attended the bond hearing in his criminal case in the Superior Court of Gwinnett County.  (Id.) Plaintiff alleges that he did not have hearing aids, his prescription eyeglasses, or adequate batteries for his portable oxygen unit at that hearing.  Plaintiff further alleges that the state courtroom does not have an ADA-compliant sound system for the hearing impaired and that the judge who presided over the bond hearing made no efforts to accommodate him.  (Id.)  As a result, Plaintiff contends he was unable to clearly see and hear witnesses and had difficulty breathing.  (Id.)

Plaintiff's proposed new ADA claim does not concern Jail policies or conditions at the Jail, unlike the claims in his original and first amended complaint that now have been finally adjudicated.  The alleged failure to accommodate certain disabilities so Plaintiff can participate at hearings in the state criminal case

is unrelated to the ADA claim in this case regarding accommodation of separate disabilities with a typewriter in Plaintiff's Jail cell.  The Court has conducted a consolidated hearing and trial on the merits of Plaintiff's claims regarding the conditions at the Jail.  Adding an unrelated claim regarding the conditions at a courthouse, particularly where the claim involves proceedings in an ongoing criminal case in state court, is inefficient and unwarranted, and his motion to amend is denied.  Plaintiff may assert the unrelated claim in a separate action against the appropriate individuals or entities.[30]

## IV.   CONCLUSION

The Court concludes that Defendants are not violating Plaintiff's rights to practice his religion.  Defendants have not violated RLUIPA, including because there is no evidence that the Jail receives federal funding in connection with the book policies at issue here.  There also is no basis to conclude that Defendants violated Plaintiff's First Amendment rights because the evidence demonstrates that the Jail's book policies are reasonably related to legitimate penological interests.

---

[30]   There is no prejudice to Plaintiff in doing so as the claim is based on recent events for which the statute of limitations does not appear to have run.  Plaintiff should consider whether Defendants are the appropriate parties to any such action.

The Jail's policy regarding access to the legal books, including maintenance of them in Plaintiff's cell, does not constitute punishment of Plaintiff in violation of his due process rights under the Fourteenth Amendment.

The Court concludes further that providing Plaintiff a typewriter in his cell is not a reasonable accommodation under Title II of the ADA.  Plaintiff is able to write by hand extensively, and, importantly, Plaintiff is given substantial access to a typewriter in the Jail's law library, and he has other means of communication. Providing Plaintiff with a typewriter in his cell would fundamentally alter the nature of the Jail's core detention function and impose an undue burden.

Accordingly, and for the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary and Permanent Injunction [2] is **DENIED**.  Defendants' First Motion for Summary Judgment [13] is **DENIED AS MOOT**.  Plaintiff's Motion for Leave to File Second Amendment to Verified Complaint [12] is **DENIED WITHOUT PREJUDICE** to Plaintiff's right to present the unrelated claim in a separate suit against the appropriate parties.  The Clerk is **DIRECTED** to enter judgment for

Defendants and close this case.

     **SO ORDERED** this 23rd day of August, 2013.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE